Filed 7/15/26  P. v. Schiefer CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN SCHIEFER,<br><br>    Defendant and Appellant. | 2d Crim. No. B335154<br>(Super. Ct. No. SA101219)<br>(Los Angeles County) |

John Schiefer appeals the judgment entered after a jury found him guilty of first degree murder.  (Pen. Code, §§ 187, subd. (a), 189, subd. (a).)[1]  Appellant contends the evidence is insufficient to support his conviction.  He asks us to review an in camera hearing to determine whether the trial court abused its discretion in ruling on his discovery motion under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).  We correct a clerical error in the abstract of judgment and affirm.

---

[1] All statutory references are to the Penal Code.

*Procedural Background*

Shavonne (aka Erica) Webster, Haena Worthing, and appellant were charged with murdering William Webb (William). The information alleged that, in the commission of the offense, appellant and Webster had personally used a deadly or dangerous weapon – a hammer.

Worthing pleaded guilty to voluntary manslaughter (§ 192, subd. (a)) and another offense.[2] After a jury trial, both appellant and Webster were convicted of first degree murder. As to appellant, the jury found "not true" the personal use allegation. As to Webster, the jury found "true" the same allegation. Appellant was sentenced to prison for 25 years to life.

*Facts*

On August 16, 2019, William's burned body was discovered on the side of a road in the area of Joshua Tree National Park. The cause of death was "[b]lunt force injury to the [back of the] head." A forensic pathologist opined that "the damage to the back of the head was done with a hammer or some other type of tool that's consistent with a hammer." The tool had made holes in the skull that exposed the brain. The pathologist identified between 15 and 20 lacerations on the back of William's head. Other portions of his head had non-fatal wounds. There were also injuries to his ribs that could have been caused by a fall. After William's death, more than 90 percent of his body sustained "thermal injuries."

William was 72 years old. His body weighed approximately 116 pounds and was five feet, eight inches tall. The forensic pathologist testified that "thermal injuries do burn off liquid, so

---

[2] The record on appeal does not disclose the nature of the other offense.

2

he would have [weighed] more than 116 pounds" when he died. Appellant weighed about 235 pounds and was six feet, three inches tall. At the time of trial in March 2023, appellant was 42 years old.

William and his former wife, Deborah, owned a home in Marina Del Rey. William wanted to sell the home, but Deborah tried to block a sale. Over Deborah's objection, William succeeded in arranging a sale. Escrow was scheduled to close on August 23, 2019.

Deborah had three children from prior relationships. One of her children was codefendant Haena Worthing. Joey Valentino was a close friend of both Worthing and appellant. In August 2019 Valentino was living in Worthing's apartment with appellant and appellant's girlfriend, codefendant Erica Webster.

Valentino testified that Worthing had expressed anger at William.[3] Valentino believed that, on two or three occasions, he had heard Worthing " 'say [something] about "killing this mother fucker" in reference to [William].' " Valentino further testified that, "a couple of days" before William died, appellant and Webster had moved into the Marina Del Rey home. Worthing and her daughter were already living there.

On August 15, 2019, Valentino had two telephone conversations with appellant. Both times, appellant telephoned Valentino. During the first conversation, appellant said, " 'William kept bugging Erica [Webster], harassing her for some money behind his back, trying to charge them to stay there [the Marina Del Rey home] when they were guests from the

---

[3] Valentino was unavailable to testify at trial. The transcript of his preliminary hearing testimony was read to the jury.

beginning.' " Appellant said " '[h]e was going to nail him [William] with a hammer.' " Valentino warned appellant, " ' "If you use a hammer that is fucking murder, you idiot." ' " Appellant testified that he had spoken to Valentino "minutes" before William was killed.

The second time appellant telephoned Valentino, appellant " 'just said, "it's all done." ' " Valentino asked, " ' "What's done?" ' " Appellant replied, " 'William.' " Valentino believed that appellant had said, " ' "He is dead," ' " and " ' "I slipped him with a hammer." ' " Valentino responded, " ' "You could have just pushed him off the stairs, let him fall by himself." ' " Appellant " 'started laughing, and he was really serious. He told [Valentino], "It's not a joke." ' " After the conversation, appellant texted Valentino a photo of William's bloody body. A detective testified that Valentino had told him that appellant said, " 'I slipped him with a hammer.' "

Appellant testified that, during the second conversation with Valentino, he "wanted [Valentino] to believe that [he] hit [William] with a hammer." Appellant explained that he was "protecting [his] girlfriend," Webster.

After appellant was arrested, detectives placed an informant in his cell. Appellant described to the informant the circumstances surrounding the killing. Appellant said: "That fool [William] was a fucking rapist child molester, man." The informant asked, " 'So when you found out, you were like, 'Fuck, I got to take him out'?" Appellant replied, "Yeah." Appellant said his "homie was gonna do it, but . . . he didn't make it in time, so we did it and fucking dealt with it . . . ."

4

Appellant testified that the "homie" he was referring to was Valentino. Appellant further testified that his statements to the informant about his "homie" were lies and "puffery."

Appellant told the informant that he "was choking [William] out" and William "was almost dead." While this was happening, his girlfriend hit William 15 times in the head with a hammer. She "had [the hammer] in her hand the whole time." Appellant was "just choking him out" and was "holding [him] down." Appellant then "threw [William] down the stairs." Appellant "[p]ut [William's] ass in the car, [and] drove him out to the fucking desert." Appellant "was there" when William's body was burned. Although appellant said his girlfriend had inflicted the blows with the hammer, he initially told the informant that his "girl" had not see him "do it" and "won't tell."

In his reply brief appellant acknowledges that he "told the [informant] that Deborah [the former wife of William] and Worthing gave him William's credit cards *after* the murder." Appellant used the credit cards to make purchases.

Appellant testified as follows: On August 15, 2019, appellant and Webster were inside William's home when William said they had to move out. Appellant replied that William "was inappropriate with women and children, and at that point, [William] tried to attack [him]." William "came at [appellant], and with his right hand he tried to hit appellant." Appellant "grabbed" William "[a]nd held him against the wall."

Appellant "couldn't handle [William] anymore so [he] yelled for help." "[Webster] came out and she hit William with a hammer a couple of times at the top of the stairs." The hammer blows were delivered to William's head. Appellant testified: "[William] let go, and at that point, I noticed the blood and I had

5

to . . . act, so I flipped [William] down the stairs." "He came charging back up, and . . . tried to attack me again."

Appellant, Webster, and William struggled on the stairs. Webster "started to hit [William] again." Appellant sat down because he had a bad back and was unable to further engage in the struggle. The next thing he remembered was seeing William "lying face down on the stairs and there is blood everywhere." Webster was "kind of next to [William's] body" and was holding the hammer.

Appellant did not want William to die. He never hit William with the hammer. But he admitted ownership of the hammer. He testified that it "came from [his] laptop case." Appellant was impeached with prior felony convictions.

Worthing testified that she was inside the Marina Del Rey home during the fight between appellant and William. Before the fight began, she saw appellant grab a hammer. Appellant then walked into the hallway where he angrily confronted William and said, " 'Don't disrespect my wife [referring to Webster]. I told him not to disrespect my wife like that.' " Worthing saw William "rush at" appellant, but could not see what happened after that. She heard the fight but did not witness it.

Codefendant Webster did not testify.

*Substantial Evidence Supports the Theory that*
*Appellant Was the Direct Perpetrator of the Murder*

In his opening brief appellant states: "[The prosecution] presented two theories of first-degree murder: (1) [appellant was] the direct perpetrator who hit William with the hammer, the act

6

that caused . . . death [record citation,][4] and (2) [he was] the aider and abettor who aided and abetted Webster, the direct perpetrator."  Appellant argues:  "The jury rejected the direct perpetrator theory when it found not true the allegation [appellant] personally used a deadly weapon."  "There is no substantial evidence supporting the prosecution's aiding and abetting theory . . . ."

In evaluating a sufficiency of the evidence claim, the appellate " ' "court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a *reasonable trier of fact* could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 277 (*Ghobrial*).)  We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial

---

[4] The prosecutor told the jury, "[Appellant] and Erica Webster are what are known as the direct perpetrators, the ones who committed the actual act that murdered William Webb."

7

evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Appellant claims that, because the jury found "not true" the personal use allegation as to him, the test for sufficiency of the evidence is whether there is substantial evidence in support of the aiding and abetting theory. The Court of Appeal rejected a similar claim by the defendant in *People v. Miranda* (2011) 192 Cal.App.4th 398 (*Miranda*). There, the jury found " 'not true' " personal gun-use enhancement allegations. Based on this finding, the defendant contended the jury "necessarily found defendant guilty . . . only as an aider and abettor . . . . Stated in the converse, the jury must have found defendant was not the direct perpetrator of any of the crimes." (*Id.*, at p. 405.) The Court of Appeal concluded that "under the inconsistent verdict doctrine, the 'not true' finding on the personal use enhancements does not inexorably lead to a finding that defendant was not the direct perpetrator of the substantive offenses." (*Ibid.*)

The *Miranda* court explained: "In part, section 954 provides: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' It is well established that, under section 954, inconsistent verdicts are allowed to stand if the verdicts are otherwise supported by substantial evidence. [Citation.] '[A]ny verdict of guilty that is sufficiently certain is a valid verdict even though the jury's action in returning it was, in a legal sense, inconsistent with its action in returning another verdict of acquittal or guilt of a different offense.' [Citation.] The rule applies equally to inconsistent enhancement findings [citation], and to an enhancement finding that is inconsistent with the verdict on a substantive offense [citation]. In [*People v. Lewis* (2001) 25 Cal.4th 610, 656] the court explained,

8

' "Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient." [Citation.]' [Citation.] 'An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict. . . .' " (*Miranda*, *supra*, 192 Cal.App.4th at pp. 405-406; accord, *People v. Carter* (2019) 34 Cal.App.5th 831, 843; *People v. Federico* (1981) 127 Cal.App.3d 20, 31-33.)

" '[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*Ghobrial*, *supra*, 5 Cal.5th at p. 281.) The testimony of multiple witnesses supports the theory that appellant was a direct perpetrator of the hammer blows that caused William's death. Appellant admitted that the hammer belonged to him. Worthing saw appellant grab the hammer and walk into the hallway where he angrily confronted William. During appellant's first conversation with Valentino, appellant said " '[h]e was going to nail [William] with a hammer.' " During the second conversation, appellant said William was dead and that he had " ' "slipped him with a hammer." ' " Appellant did not tell Valentino that Webster had used the hammer. Appellant mentioned Webster's use of the hammer during his conversation with the informant. But at the beginning of the conversation, appellant said his "girl" did not see him "do it" and "won't tell."

Even if the jury had found appellant guilty of murder only as an aider and abettor, substantial evidence would still have supported the conviction. "Under a direct aider and abettor liability theory, the prosecution must prove the person who is not

9

the actual killer 'engaged in the requisite acts and had the requisite intent' to aid and abet the target crime of murder. [Citation.] A direct aider and abettor's 'guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*People v. Pacheco* (2022) 76 Cal.App.5th 118, 124.)

If Webster had solely inflicted the hammer blows to William's head, ample evidence shows that appellant engaged in the requisite acts and had the requisite intent for liability as an aider and abettor of murder. Appellant and Webster worked in tandem to kill William. It is reasonable to infer that appellant supplied Webster with the hammer for the purpose of killing William. The hammer belonged to appellant, and he grabbed it before he went into the hallway to confront William. Appellant told the informant that, while Webster was hitting William with the hammer, appellant "was choking [William] out" to the point that he "was almost dead." Appellant was "holding [William] down" "the whole time" so that he could not defend himself.

It is also reasonable to infer that appellant knew and intended that the 15 to 20 powerful hammer blows to the back of William's head would be fatal. Appellant testified that the blows sounded as if Webster had "smashed a pumpkin or a watermelon." There was no need to inflict so may blows if they had not intended to kill William.

*Substantial Evidence Supports the Jury's Finding that*
*Appellant Premeditated and Deliberated the Murder*

Appellant contends there is no substantial evidence that appellant personally premeditated and deliberated the murder. " 'Murder that is premeditated and deliberated is murder of the first degree.' [Citation.] The very definition of 'premeditation'

10

encompasses the idea that a defendant thought about or considered the act beforehand. ' " '[P]remeditation' means thought over in advance," ' and ' " '[d]eliberation' refers to careful weighing of considerations in forming a course of action . . . ." ' [Citations.] 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

Substantial evidence supports the jury's finding that appellant personally premeditated and deliberated the murder. The jury reasonably inferred that, prior to the confrontation with William in the hallway, appellant had planned to kill William with the hammer. Valentino testified that, during the first telephone conversation on the day William was killed, appellant complained, " 'William kept bugging Erica [Webster], harassing her for some money behind his back, trying to charge them to stay [in the Marina Del Rey home] when they were guests from the beginning.' " Appellant declared that " '[h]e was going to nail [William] with a hammer.' " Valentino warned appellant, " ' "If you use a hammer that is fucking murder, you idiot." ' "

Before he went into the hallway to confront William, appellant grabbed the hammer. It is reasonable to infer that he intended to use the hammer against William, just as he had said he would in the prior conversation with Valentino, despite Valentino's warning that he would be committing murder. " ' " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' . . . " ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)

Appellant told the informant that he had planned to kill William. Appellant said: "That fool [William] was a fucking rapist child molester, man." The informant asked, " 'So when you found out, you were like, 'Fuck, I got to take him out'?" Appellant replied, "Yeah." Appellant said his "homie was gonna do it, but . . . he didn't make it in time, so we did it and fucking dealt with it . . . ."

The People claim: "[I]n addition to appellant's acknowledgement that a plan in fact existed, there was circumstantial evidence of another plan to kill William, which appellant was aware of and in which he was to play a key role. The goal of that plan was to prevent the close of escrow on the [Marina Del Rey home] in late August 2019." We need not consider this additional theory of a plan to kill William. Irrespective of whether such a plan existed, there is ample evidence of premeditation and deliberation.

*Appellant's Brady Motion*

Appellant notes that he "joined in Worthing's request for disclosure of *Brady* . . . information in police personnel files . . . ." (*Brady*, *supra*, 373 U.S. 83.) After conducting an in camera hearing, the trial court ordered that three complaints be disclosed. Appellant requests that we review the in camera hearing "to determine whether the lower court abused its discretion by concluding [that] there was no [other] relevant discoverable *Brady* information to turn over to the defense."

" 'Under *Brady*, . . . the prosecution must disclose to the defense any evidence that is "favorable to the accused" and is "material" on the issue of either guilt or punishment.' [Citation.] ' "[E]vidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness." ' "

12

(*Schneider v. Superior Court* (2025) 111 Cal.App.5th 613, 624 (*Schneider*).) " '[E]vidence is "material" only if it is reasonably probable a prosecution's outcome would have been different had the evidence been disclosed.' " (***Id***., at p. 629.) " 'The requisite "reasonable probability" is a probability sufficient to "undermine[] confidence in the outcome" on the part of the reviewing court.' " (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 418.)

"[A] citizen complaint that has been deemed unfounded typically would not meet *Brady*'s . . . materiality standards." (*Schneider, supra*, 111 Cal.App.5th at p. 629.) "[W]hen a court determines that an officer's personnel file contains *Brady* information, by definition, the relevance of the material is not 'minimal.' Rather, the court has concluded that the information has the potential to affect the outcome of the trial." (*Id.*, at p. 631.)

We review the trial court's *Brady* ruling for abuse of discretion. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 466.) " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. . . .' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

We have reviewed the transcript of the in camera hearing. We conclude the trial court did not abuse its discretion in ruling that there was no discoverable *Brady* information in addition to the three complaints that it ordered disclosed.

*Correction of Abstract of Judgment*

The abstract of judgment erroneously shows that appellant was convicted of second degree murder. The People request that

13

the abstract be corrected to show that he was convicted of first degree murder.

*Disposition*

The judgment is affirmed. The trial court is directed to correct the abstract of judgment to show that appellant was convicted of first degree murder. The trial court shall send a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.


We concur:


BALTODANO, J.


CODY, J.

14

William L. Sadler, Judge

Superior Court County of Los Angeles

_____

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Ana R. Duarte, Deputy Attorney General, for Plaintiff and Respondent.